# In the United States Court of Federal Claims

No. 08-718
Filed: March 16, 2010
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | |
| JAY NANCE, *et al*., | * | |
| | * | Just Compensation Clause of the Fifth |
| Plaintiffs, | * | Amendment of the United States |
| | * | Constitution, U.S. CONST. amend V; |
| v. | * | Motion to Dismiss, RCFC 12(b)(1); |
| | * | Statute of Limitations; |
| | * | Surface Mining Control and Reclamation |
| THE UNITED STATES, | * | Act of 1977, 30 U.S.C. § 1201, *et seq.* |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Philip Lance McGrady**, Edwards, Frickle & Culver, Billings, Montana, Counsel for Plaintiffs.

**Lary Cook Larson**, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C., Counsel for Defendant.

### MEMORANDUM OPINION AND FINAL ORDER

This case involves allegations of the taking of coal rights, located in the Tongue River Valley, near Birney, Montana.

## I.   RELEVANT FACTS.[1]

On August 3, 1977, Congress enacted the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations" and to "assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided[.]" Pub. L. No. 95-87, 91 Stat. 445 (codified as amended at 30 U.S.C. §§ 1201-1328 (2006)). SMCRA sets national statutory minimum standards, but permits the states to regulate surface mining in their respective jurisdictions upon approval by the Secretary of the Interior ("Secretary"). 30 U.S.C. § 1253 ("Each State in which there are or may be conducted surface coal mining operations on non-Federal lands, and which wishes to assume exclusive jurisdiction over the regulation of surface coal mining . . . shall submit to the Secretary . . . a State program [for] carrying out the provisions of this chapter and meeting its purposes[.]"). But, SMCRA

---

[1] The facts recited herein were derived from the October 10, 2008 Complaint ("Compl.") and attached exhibits ("Pl. Ex.").

prohibits any surface coal mining operations that are not subject to a state-issued permit.  30 U.S.C. § 1256.

SMCRA further prohibits any fee owner of coal located west of the hundredth meridian and part of an "alluvial valley floor"[2] from engaging in mining activities on such coal, unless a permit or revised application was issued.  30 U.S.C. § 1260(b)(5).[3]  No permits are to be issued, unless the applicant demonstrates that mining will not "interrupt, discontinue, or preclude

_____

[2] Although not defined by the SMCRA, an "alluvial valley floor" is defined in Montana state law as: "the unconsolidated stream-laid deposits holding streams where water availability is sufficient for subirrigation or flood irrigation agricultural activities."  MONT. CODE ANN. § 82-4-203 (2009).

[3] Section 1260 of Title 30 of the United States Code states in relevant part:

(b) Requirements for approval:

No permit or revision application shall be approved unless the application affirmatively demonstrates and the regulatory authority finds in writing on the basis of the information set forth in the application or from information otherwise available which will be documented in the approval, and made available to the applicant, that–

    (5) the proposed surface coal mining operation, *if located west of the one hundredth meridian west longitude*, would--

        (A) not interrupt, discontinue, or preclude farming on *alluvial valley floors* that are irrigated or naturally subirrigated, but, excluding undeveloped range lands which are not significant to farming on said alluvial valley floors and those lands as to which the regulatory authority finds that if the farming that will be interrupted, discontinued, or precluded is of such small acreage as to be of negligible impact on the farm's agricultural production, or

        (B) not materially damage the quantity or quality of water in surface or underground water systems that supply these valley floors in (A) of subsection (b)(5) of this section.

        *Provided*, That this paragraph (5) shall not affect those surface coal mining operations which in the year preceding August 3, 1977, (I) produced coal in commercial quantities, and were located within or adjacent to alluvial valley floors or (II) had obtained specific permit approval by the State regulatory authority to conduct surface coal mining operations within said alluvial valley floors.

30 U.S.C. § 1260(b)(5) (emphasis added).

farming" or "materially damage the quantity or quality of water" on or under the alluvial valley floor.  30 U.S.C. § 1260(b)(5)(A)-(B).  If a permit or revised application is denied, the Secretary has authority:

> in accordance with such regulations as the Secretary may prescribe, to enter into an agreement with that operator pursuant to which the Secretary *may, notwithstanding any other provision of law* . . .  pursuant to section 1716 of Title 43, *convey to the fee holder* of any such coal deposits involving such mining operations the fee title to other available Federal coal deposits *in exchange for the fee title* to such deposits so involving such mining operations.[4]

*Id*. (emphasis added).

This provision further states that "[i]t is the policy of the Congress that the Secretary shall develop and carry out a coal exchange program to acquire private fee coal precluded from being mined by the restrictions of this paragraph [] in exchange for Federal coal which is not so precluded."  *Id.*

Jay Nance, Brett Boedecker (the personal representative of the Estate of Susan Boedecker), Joseph Hayes, Patricia Hayes Rodolph, and the Brown Cattle Company Shareholders Coal Trust[5] (collectively hereinafter "Plaintiffs") are fee owners of a large block of "valuable and competitive coal" located near Birney, Montana, beneath Plaintiffs' adjacent family ranches.  *See* Compl. ¶¶ 1-5, 9-10.  This coal, however, lies west of the hundredth meridian in an alluvial valley floor of the Tongue River Valley.  *Id*. ¶ 1.

In 1974, prior to the enactment of SMCRA, the Nance and Hayes families entered into an exploration-option agreement with Wesco Resources to conduct coal exploration.  *Id*. ¶ 11.  Thereafter, on March 6, 1976, Wesco Resources exercised an option to lease 3,839.5 acres of Plaintiffs' coal, and later assigned that lease to Montco, LLP.  *Id*. ¶ 13; *see also* Pl. Ex. 1 at ¶ 4 (Gustafson Decl.).

On February 28 and March 4, 1977, Mark Nance, the father of Plaintiffs Jay Nance and Susan Boedecker, and Arthur Hayes, the father of Plaintiffs Joseph Hayes and Patricia Hayes Rodolph, testified before the House Committee on Interior and Insular Affairs in opposition to the proposed alluvial valley floor restriction in SMCRA.  *See* Compl. ¶¶ 9, 14.  Although SMCRA ultimately included the alluvial valley floor restriction, Plaintiffs' claim that former Wyoming Senator Malcolm Wallop, a primary sponsor of SMCRA, "personally assured Mark

---

[4] The omitted portion of this statute provides that the Secretary may "lease other Federal coal deposits to such operator in exchange for the relinquishment by such operator of his Federal lease covering coal deposits involving such mining operations[.]"  30 U.S.C. § 1260(b)(5)(A)-(B).  This portion of the statute is inapplicable here, since Plaintiffs' claim involves only land held in fee, not relinquishment of a federal lease.

[5] Jay Nance, Joseph Hayes, and Patricia Hayes Rodolph are the trustees of the Brown Cattle Company Shareholders Coal Trust.  *See* Compl. ¶ 5.

Nance and Jay Nance that the [Nance and Hayes] families had been 'taken care of' by the inclusion of the exchange provision," in 30 U.S.C. § 1260(b)(5).  Compl. ¶ 15.

In 1980, Montco, LLP requested a mine permit application from the Montana Department of State Lands.  *Id*. ¶¶ 17-18.  A permit was issued in 1984.  *Id*. ¶ 19.  Thereafter, Montco, LLP funded and submitted an alluvial valley floor findings report to the Montana Department of State Lands, together with a petition for a declaratory ruling regarding the 3,839.5 acres of coal.  *Id*. ¶ 20.  On May 19, 1986, the Montana Department of State Lands issued a finding that, because 2,346 of the 3,839.5 acres of coal leased by Montco, LLP met the alluvial valley floor restriction criteria of SMCRA, a surface mining permit for those acres would not be issued.  *Id*. ¶ 24;[6] *see also* Pl. Ex. 1 at ¶ 10.  Consequently, Plaintiffs' coal could not be mined.  *See* Compl. ¶ 25.

On January 6, 1985, the Department of Interior ("DOI") prepared a guidance memo on fee coal exchanges providing:

> [i]f a fee coal within an [alluvial valley floor] is rendered unmineable by SMCRA's prohibitions, the Secretary must conclude an exchange.  The non-Federal party need not prove that he made substantial financial or legal commitments prior to the passage of SMCRA.

*Id*. ¶ 21 (emphasis added).

This exchange provision was designed "to make the private party 'whole,' that is, to place him in the same position he would have been had SMCRA not been passed."  *Id*. ¶ 22.  During the next twelve years, neither Montco, LLP nor Plaintiffs were able to effectuate an exchange with DOI.  *Id*. ¶¶ 28-29.

On September 22, 1997, however, the Bureau of Land Management ("BLM") published a notice that it was "considering an alluvial valley floor fee (private) coal exchange" of approximately 3,737.99 acres of fee coal in the alluvial valley floor of the Tongue River for "federal coal of equal value[.]"  *Id*. ¶ 30.  On July 24, 2000, BLM sent a draft of the "contract specifications" to one of Plaintiffs' attorneys, stating that "[t]he date of value in the appraisal report shall be as of the passage of the [SMCRA], 1977."  *Id*. ¶ 31.  In the summer of 2001, BLM conducted a retrospective appraisal of Plaintiffs' coal and concluded that the value, as of August 1977, was approximately $3.2 million.  *Id*. ¶ 32.

Thereafter, Plaintiffs, met with BLM officials on several occasions over the next two years to negotiate the value of an exchange.  *Id*. ¶¶ 33-36.  In June of 2003, Plaintiffs and BLM agreed to an exchange of coal worth $15 million; however, later that year, the DOI decided to convert the coal exchange to a cash settlement, as reflected in an "Insert for Appropriates Bill" stating that "the Secretary shall acquire the privately-owned coal deposits underlying the lands . . . for the price of $15,000,000."  *Id*. ¶¶ 36-37.  Plaintiffs, however, never received payment.  *Id*. ¶ 39.

---

[6] The record is unclear as to whether the 1984 permit was cancelled, but it was issued prior to a determination of the status of the land under SMCRA.

In 2005, Plaintiffs contacted Montana Senator Conrad Burns for assistance, who, in turn, sent a letter to the Secretary of the Department of Interior on June 8, 2005, complaining about the fact that Plaintiffs "have been negotiating unsuccessfully with the Department of Interior, Bureau of Land Management for either an exchange of coal or compensation for their coal for the last thirty (30) years." *Id*. ¶ 41.  On December 12, 2005, the DOI's Deputy Assistant Secretary of Land and Minerals Management responded, admitting that exchange communications with Plaintiffs had a "complicated history[,] and negotiations have taken place over a long period of time." *Id*. ¶ 44.  Plaintiffs were then informed that they could continue to negotiate for a coal exchange, litigate, or seek a legislative solution. *Id*. ¶ 45.  Plaintiffs received no further communication from the DOI.  *Id*. ¶¶ 46-47.[7]

## II.   PROCEDURAL HISTORY.

### A.   Before The United States District Court For The District Of Montana.

On August 29, 2006, Plaintiffs filed a complaint in the United States District Court for the District of Montana ("Montana District Court") against the Secretary of the Interior seeking a court ordered coal exchange "equal to their entire fee coal interest valued at the date of SMCRA's passage in 1977, plus all escalations in value due to the passage of time, as well as interest on all monies the Plaintiffs have been deprived of for thirty years.  *See Nance* v. *Sec'y of U.S. Dep't of Interior*, No. CV-06-125-BLG-RFC (D. Mont. filed Aug. 29, 2006), Complaint ¶ 77.

On December 9, 2008, the Montana District Court entered a Scheduling Order directing the DOI to complete a coal exchange with Plaintiffs by July 10, 2009.  *See* Scheduling Order, *Nance*, No. CV-06-125-BLG-RFC (D. Mont. Dec. 9, 2008).  This Scheduling Order was later amended on the Government's Motion For Reconsideration to extend the coal exchange completion deadline to July 2, 2010.  *See* Order, *Nance*, No. CV-06-125-BLG-RFC (D. Mont. May 19, 2009).  This court ordered coal exchange is currently proceeding under the supervision of the Montana District Court.

### B.   Before The United States Court Of Federal Claims.

On October 8, 2008, Plaintiffs filed a Complaint in the United States Court of Federal Claims, alleging that the United States had engaged in a taking of Plaintiffs' property rights for public use, without just compensation, in violation of the Fifth Amendment of the United States Constitution.[8]  *See* Compl. ¶¶ 52-53.  The Complaint specifically alleges that "Plaintiffs have

---

[7] The Complaint states that several members of the Nance and Hayes families died during the families' pursuit of a coal exchange under SMCRA.  *See* Compl. ¶¶ 40, 48.

[8] The Fifth Amendment of the United States Constitution provides, in relevant part:

No person shall be . . . deprived of . . . property, without due process of law; *nor shall private property be taken for public use, without just compensation*.

U.S. Const. amend V. (emphasis added).

been led to believe, for nearly thirty years, that they were going to receive a coal exchange as the law of the United States of America requires" and, because of the Government's actions, have suffered approximately $275 million in damages, not including attorney fees and court costs. *Id.* ¶¶ 49, 54-55.

On December 8, 2008, the Government filed a Motion To Dismiss Plaintiff's Complaint For Lack Of Jurisdiction Over The Subject Matter And Memorandum In Support Thereof ("Gov't Mot. Dismiss"). On January 8, 2009, Plaintiffs filed a Brief In Opposition ("Pl. Opp.") and requested oral argument.

On February 25, 2009, the Government filed a Reply ("Gov't Reply"). On March 5, 2009, pursuant to a March 3, 2009 telephone status conference, the court issued an Order staying the case in light of the parallel litigation in the United States District Court for the District of Montana. Pursuant to a January 11, 2010 conference call between the court and the parties, on January 12, 2010, the court issued an Order lifting that stay to rule on the Government's December 8, 2008 Motion To Dismiss.

## III.   DISCUSSION.

### A.   Jurisdiction.

The jurisdiction of the United States Court of Federal Claims is established by the Tucker Act, 28 U.S.C. § 1491 (2006). This Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute and it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [it] whenever a substantive right . . . exists." *United States* v. *Testan*, 424 U.S. 392, 398 (1976). Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. *Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. In the parlance of Tucker Act cases, that source must be money-mandating.") (internal citations and quotations omitted). The burden of establishing jurisdiction falls upon the plaintiff. *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden to allege facts sufficient to establish jurisdiction resides with plaintiff); *see also* RCFC 12(b)(1).

The United States Court of Appeals for the Federal Circuit has held that the Takings Clause of the Fifth Amendment is "money-mandating." *See Moden* v. *United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005). Consequently, "to the extent [Plaintiffs] have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper." *Id.*; *see also United States* v. *Causby*, 328 U.S. 256, 267 (1946) ("If there is a taking, the claim is

founded upon the Constitution and within the jurisdiction of the Court of Claims to hear and determine.") (internal quotation omitted).

**B.      Standard For Decision On A Motion To Dismiss, Pursuant To RCFC 12(b)(1).**

A challenge to the "[United States Court of Federal Claims'] general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion[.]" *Palmer* v. *United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999) (citing RCFC 12(b)(1) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:  (1) lack of jurisdiction over the subject matter[.]")).  When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor."  *Henke* v. *United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).  Nonetheless, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Reynolds* v. *Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . [plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

**C.      The Government's December 8, 2008 Motion To Dismiss, Pursuant To RCFC 12(b)(1).**

**1.      The Parties' Arguments.**

**a.      The Government's Argument.[9]**

The Government asserts that the court does not have jurisdiction over Plaintiffs' claims, because they are barred by the six-year statute of limitations.  *See* Gov't Mot. Dismiss at 2 (quoting 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.")).

First, the Government's waiver of sovereign immunity is a jurisdictional requirement that must be strictly construed.  *Id.* at 3.  Therefore, the United States Court of Federal Claims is precluded from extending the limitations period for equitable reasons.  *Id.* at 3-4 ("Exceptions to the limitations and conditions upon which the government consents to be sued cannot be implied, nor can exceptions be engrafted on the statute of limitations so as to allow claims to be asserted beyond the six year time limit set forth in Section 2501.").

---

[9] The Government accepts as true the facts as alleged in the October 8, 2008 Complaint for purposes of the Motion To Dismiss; however "[t]he United States generally denies the allegations in the Complaint, denies that it has taken the Plaintiffs' property, and avers that it has valid defenses to the Plaintiffs' claims."  *See* Gov't Mot. Dismiss at 2 n.1.

Second, "[a] takings claim accrues when all events which determine the liability of the government have occurred and the plaintiff knew or should have known of the events." *Id*. at 4. Once a claim has accrued, it can only be suspended "for purposes of the statute of limitations when the government has concealed its acts so that the plaintiff was unaware of the government's actions, or the injury suffered by the plaintiff was inherently unknowable at the time the wrong occurred." *Id*. Neither is the case here. *Id*. If the Government's actions are "open and notorious," a plaintiff is put on inquiry notice as to his or her potential injury, and "[o]nce a plaintiff is put on notice that he has a potential claim, the statute of limitations begins to run." *Id*. at 4-5.

The facts alleged in the Complaint make clear that "any taking in this case occurred upon enactment of SMCRA in 1977, and [] Plaintiffs' cause of action for an alleged taking necessarily accrued on that same date." *Id*. at 6. Plaintiffs were put on notice of their potential claim, because the enactment of SMCRA was open and notorious. *Id*. In fact, Plaintiffs' predecessors testified before Congress before the passage of SMCRA, so they "were well aware that enactment of SMCRA would have an effect on their property rights." *Id*. at 7.

In the alternative, Plaintiffs' takings claim accrued no later than March 1986, when the State of Montana Department of State Lands issued a declaratory ruling that 2,346 acres of Plaintiffs' coal met the alluvial valley floor criteria in 30 U.S.C. § 1260 and could not legally be mined. *Id*. at 7. The Complaint, however, was filed more than twenty years after this ruling. *Id*. Therefore, whether the court determines Plaintiffs' cause of action accrued in 1977 or 1986, the Complaint, nevertheless, must be dismissed, because the claims therein are barred by the six-year statute of limitations. *Id*.

### b.    Plaintiffs' Response.

Plaintiffs respond that their cause of action is not time-barred, because their takings claim did not accrue until December 2005, when the Deputy Assistant Secretary of Land and Minerals Management "drew the line in the sand and ended years of delay and concealment." Pl. Opp. at 9. Under the "accrual suspension rule," "'the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed.'" *Id*. at 10-11 (quoting *Young* v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008)). Plaintiffs contend that the statue of limitations can be suspended where "'the defendant has concealed its acts with the result that plaintiff was unaware of their existence'" *or* "'that its injury was inherently unknowable at the accrual date,'" *id*. at 11 (quoting *Young*, 529 F.3d at 1384), and both apply here. Pl. Opp. at 11.

Plaintiffs claim their injury was "inherently unknowable" and analogize their case to one where a "'defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit.'" *Id.* (quoting *Japanese War Notes Claimants Ass'n of Philippines, Inc.* v. *United States*, 373 F.2d 356, 359 (Ct. Cl. 1967) ("Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date.  An example of the latter would be when defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit.")).  Plaintiffs argue:

> In 1977 the Government delivered to the Plaintiffs a "fruit tree" with the passage of SMCRA -- and the Plaintiffs tended to this barren "fruit tree" for the next twenty-eight years, doing precisely what the Government instructed them to do. And in the process of tending to the "fruit tree," the Plaintiffs spent hundreds of thousands of dollars, tediously trying to get the "fruit tree" to bear "fruit."  After twenty-eight years of tending to the "fruit tree," in June of 2003, a mere "bud" finally formed on the tree in the form of a $15 million dollar settlement agreement.  But the fruit tree had yet to bear fruit, because the Government backpedaled and ultimately reneged on the settlement agreement.  The Plaintiffs poured more water (in the form of cash) on the fruit tree, trying to revive the bud, but to no avail.  Finally, the Government sent the letter on December 12, 2005, saying that the bud had died -- the fruit borne by the tree was dead.  Thus, the takings claim was inherently unknowable until December 12, 2005, when the tree finally bore its dead "fruit."

Pl. Opp. at 11-12.

Plaintiffs add that the coal exchange provision, also known as the Wallop Amendment, was included in SMCRA to "'take[] care of the private interests of those people who do, in fact, have a property which they will never be able to develop under the [alluvial valley restrictions] of this bill.'"  *Id.* at 12 (quoting 123 Cong. Rec. at 15755 (May 20, 1977)).  Because of the Wallop Amendment, "Plaintiffs [] believe[d] that they had been taken care of through the passage of SMCRA[,and that] SMCRA did not require them to pursue their rights in this Court." Pl. Opp. at 13.

In addition, not only was Plaintiffs' takings claim "inherently unknowable," but the Government affirmatively concealed its actions until December 12, 2005, when the Deputy Assistant Secretary of Land and Minerals Management informed Plaintiffs that their only options were to continue to negotiate for a coal exchange, litigate, or seek a legislative solution.  *Id.*; *see also* Compl. ¶ 45.  Plaintiffs argue that they repeatedly had been assured they would be compensated, as evidenced by the June 2003 exchange offer for $15 million.  *See* Pl. Opp. at 13-14; *see also* Compl. ¶ 36-37.  Plaintiffs did not know until December 12, 2005 that the Government was not going to live up to that agreement.  *See* Pl. Opp. at 14.  Since the Government "intentionally delayed this matter so as to minimize its risks, [] the Government should not be allowed to profit from its intentional delay."  *Id.*

### c.    The Government's Reply.

The Government replies that the exchange process has not ended.  *Id*. at 3 n. 2.  As the December 12, 2005 letter evidences:

> Plaintiffs [are invited] to continue the exchange process.  In fact, the exchange process is presently continuing in a judicially supervised process, as a result of the law suit  [] Plaintiffs filed in federal district court.  *See Nance* v. *Sec'y of U.S. Dep't of Interior*, No. CV-06-125-BLG-RFC (D. Mont., filed Aug. 29, 2006).  In that pending lawsuit, the [G]overnment maintains that it has not withheld an exchange and remains willing to work with Plaintiffs to consummate an exchange. [Second,] even if the December 2005 letter ended the exchange process as [] Plaintiffs argue, the regulatory exchange process and resulting negotiations are not relevant to when [] Plaintiffs' taking cause of action accrued.

*Id*.

That fact, however, is not relevant to a determination of when a takings cause of action accrues, because, the exchange process is optional under SMCRA.  *Id*. at 6 (citing *Whitney Benefits, Inc*. v. *United States*, 926 F.2d 1169, 1175-76 (Fed. Cir. 1991) (hereafter "*Whitney Benefits II*") ("'[T]he exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants, who may reject any exchange and pursue a money award under the Tucker Act, 28 U.S.C. § 1491.'" (quoting *Whitney Benefits, Inc*. v. *United States*, 752 F.2d 1554, 1560 (Fed. Cir. 1985) (hereafter "*Whitney Benefits I*"))).  Plaintiffs could have rejected an exchange and proceeded with a takings claim, "but instead they chose to work within the regulatory framework to pursue a coal exchange."  *Id*.  The exchange option, however, does not relieve Plaintiffs of the obligation under 28 U.S.C. § 2501 to file any takings claim to be adjudicated by the United States Court of Federal Claims within six years of the accrual of the claim.  *Id*.

A takings claim accrues when all events have occurred to fix liability and the plaintiff knew or should have known of the existence of these events.  *Id*. at 4-5.  "Whether all events have occurred is determined under an objective standard."  *Id*. at 5.  Plaintiffs' argument that the facts necessary for Plaintiffs to file a takings claim were "inherently unknowable" until December 2005 is without merit.  *Id*. at 6-7.  The Complaint evidences that Plaintiffs knew that SMCRA prohibited mining "at least some of their coal during the entire time that they were pursuing an exchange."  *Id*. at 7.  In addition, the Government did not conceal any of its acts relevant to Plaintiffs' takings claim.  Therefore, the "accrual suspension rule" does not apply to Plaintiffs' claim.  *Id*. at 7-8.

Moreover, unsuccessful efforts to negotiate an exchange "cannot be used to toll the statute of limitations for a takings claim."  *Id*. at 7.  Therefore, Plaintiffs' takings claim accrued in 1977 with the enactment of SMCRA, or, at the latest, in 1986, when the Montana Department of State Lands issued a declaratory ruling stating that 2,346 acres of Plaintiffs' coal could not be

mined, because of the prohibitions in SMCRA. *Id.* at 8. Accordingly, Plaintiffs' claim is time-barred and should be dismissed for lack of subject matter jurisdiction. *Id.*

## 2.  The Court's Resolution

Section 2501 of Title 28 of the United States Code provides: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2006).

The statute of limitations in 28 U.S.C. § 2501 is "jurisdictional" in nature. *See John R. Sand & Gravel Co.* v. *United States*, 552 U.S. 130 (2008). Rather than protecting "a defendant's case-specific interest in timeliness," a jurisdictional statute of limitations works "to achieve a broader system-related goal, such as facilitating the administration of claims, limiting the scope of a government waiver of sovereign immunity, or promoting judicial efficiency." *Id.* at 133-34. (citations omitted); *see also Black* v. *United States*, 84 Fed. Cl. 439, 450 (2008) ("[E]quitable tolling . . . is foreclosed by the Supreme Court's decision in *John R. Sand & Gravel Co.*"); *see also Adde* v. *United States*, 81 Fed. Cl. 415, 421 (2008) ("Equitable tolling of § 2501 is now foreclosed by binding precedent, as are similar arguments based on the doctrines of estoppel and waiver."). Thus, jurisdictional statutes of limitations require "a court to decide a timeliness question despite a waiver, or [forbid] a court to consider whether certain equitable considerations warrant extending a limitations period." 552 U.S. at 133-134**.**

As a matter of law, "[a] takings claim accrues when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *John R. Sand & Gravel Co.* v. *United States*, 457 F.3d 1345, 1355-56 (Fed. Cir. 2006), aff'd 552 U.S. 130, (2008) (internal quotation omitted). The United States Court of Appeals for the Federal Circuit has directly addressed the date of accrual of a taking under 30 U.S.C. § 1260(b)(5) in *Whitney Benefits I,* 752 F.2d 1554, and *Whitney Benefits II,* 926 F.2d 1169.

In *Whitney Benefits I,* Plaintiffs sued the Government for a taking, alleging that their right to mine their fee coal was foreclosed by the enactment of § 1260(b)(5). *Whitney Benefits I*, 752 F.2d at 1555. The Government countered that the claim was not ripe, because the plaintiffs failed to seek compensation through the exchange set forth in that statute. *Id.* The appellate court held that no such attempt was required, stating "[T]he 'exchange mechanism' is nowhere stated in the statute or legislative history. . . to be the exclusive method of ascertaining constitutional just compensation. . . . [T]he statute nowhere says the appellants are obliged to accept exchange land as 'just compensation.'" *Whitney Benefits I*, 752 F.2d at 1556. The appellate court further observed that "the pursuit of a substitution or exchange transaction under § 1260(b)(5) is not a mandatory remedy but is optional with the landowner, who *retains also the option to sue in the Claims Court for money without such pursuit.*" *Id.* at 1558 (emphasis added). In *Whitney Benefits I*, the Government's assertion that a cause of action under 30 U.S.C.§ 1260(b)(5) could not accrue prior to a pursuit of an exchange transaction was rejected:

> The major premise, that pursuit of an exchange transaction must occur and be unsuccessful before a taking can occur, is a misconstruction of the governing statute. Actually the exchange transaction is a method of ascertaining and paying

> just compensation for a taking, which may be negotiated and agreed upon either
> before or after the taking itself, and is optional with the claimants, who may reject
> any exchange and pursue a money award under the Tucker Act, 28 U.S.C. § 1491.
> Under and within the allegations of the complaint, as it is or as it may be
> amended, complainants. . . may be able to prove that a constitutional taking has
> occurred as of the date of the legislation, August 3, 1977, or some subsequent date
> that has already occurred.

752 F.2d at 1560.

This determination was reaffirmed in *Whitney Benefits II*.  There, the appellate court stated: "An offer to pay would make no sense if nothing were taken. The exchange provision confirms the presence of a taking of coal to which it applies[.]"  *Whitney Benefits II*, 926 F.2d at 1176.

Plaintiff cites *Japanese War Notes Claimants Association* v. *United States*, 373 F.2d 356 (Ct. Cl. 1967), for the proposition that accrual may be tolled if a plaintiff is able to show either "that defendant has concealed its acts with the result that plaintiff was unaware of their existence or. . . that its injury was 'inherently unknowable' at the accrual date." *Id*. at 359.  In *Japanese War Notes*, the injury alleged was the devaluation of Japanese military currency, which Japanese occupiers had forced residents of the Philippines to use prior to the end of that occupation, during the Second World War.  The Claimants in *Japanese War Notes* filed suit in 1964, seeking, *inter alia*, redemption of the Japanese military currency still in its possession, and reimbursement for counterfeit Japanese military currency circulated by the United States as part of its effort to undermine Japanese control of the Philippines.  *Id*. at 357-58.

Although Plaintiffs rely on *Japanese War Notes*, the holding of the United States Court of Claims in that case does not support Plaintiffs' position.  Rather, the Court of Claims in *Japanese War Notes* held that the statute of limitations barred the Philippine organization's suit, because the injury occurred with the end of the Japanese occupation, in 1945, nineteen years before the action was filed.  *Id*. at 358.  The Court of Claims also found that the lack of public acknowledgement of counterfeiting on the part of the United States did not toll the statute of limitations.  Even if the Plaintiff did not have actual knowledge of the counterfeiting, third-party publications referencing the counterfeiting placed Plaintiff "on inquiry that its cause of action existed at a date prior to six years before it filed its petition."  *Id*. at 359.

Under *Japanese War Notes* and more recent precedent, the facts presented by this case are insufficient to warrant tolling the statute of limitations.  *See Mapu* v. *Nicholson*, 397 F.3d 1375, 1379 (Fed. Cir. 2005) (*citing Irwin* v. *Dept. of Veterans Affairs*, 498 U.S. 89, 96 (1990)) (holding that equitable tolling in suits against the Government applies "where the claimant has actively pursued . . . judicial remedies by filing a defective only pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.").

The injury for which Plaintiffs seek compensation in this suit is the loss of the right to mine coal on their land, a loss occasioned by the passage of SMCRA.  Plaintiffs have not alleged

that the Government at any time misrepresented the effect that SMCRA would have on Plaintiffs' rights to the unhindered use of their real property. Even prior to the enactment of that Act, Plaintiffs were aware that the restriction on alluvial valley floor mining might directly impact their ability to mine for coal on their own land, Plaintiffs' predecessors testimony before the House Committee on Interior and Insular Affairs opposing this same restriction. Compl. ¶ 14. The Complaint also alleges that the 1986 ruling of the Montana Department of State Lands "rendered the Plaintiffs' entire fee coal unmineable." *Id*. ¶¶ 24-25.

The Complaint also alleges that Plaintiffs were aware of the possibility of the injury complained of on the date that the statute, against which they had testified, was enacted. Any uncertainty as to whether SMCRA prohibited Plaintiffs from mining their land was resolved against them by the 1986 Montana Department of State Lands ruling. Compl. ¶ 24. As of 1986, Plaintiffs unequivocally were divested of their fee coal rights, and were entitled to initiate an action in the United States Court of Federal Claims. *Id*. No concealed Government action, subsequent to the 1986 Montana Department of State Lands ruling, prevented Plaintiffs from filing suit.

Finally, if there was any ambiguity as to the availability of litigation as an avenue of relief, *Whitney Benefits I* fixes a date from which it was known, not only that the prohibitions set forth in SMCRA constituted an actionable taking, but also that accrual of the attendant claim could be fixed as of the passage of the statute. That decision was issued in 1985 – a year before the State of Montana determined that Plaintiffs' land fell within the prohibitions of SMCRA. *See Whitney Benefits I*, 752 F.2d at 1554. Like the plaintiffs in *Japanese War Notes*, Plaintiffs in this case reasonably should have been put on inquiry notice of their injury through third-party publications reporting the outcome of the *Whitney Benefits* litigation.[10]

---

[10] The outcome of the *Whitney Benefits* litigation was reported in an industry periodical, both before and after the 1986 Montana decision. *See Court Rules Company Can Seek Damages For Unmineable Coal*, COAL WEEK (McGraw-Hill, Inc.), Jan. 28, 1985, Vol. 11, No. 4, p. 3 ("Rebecca Thompson, lawyer for Whitney, said the appellate decision was significant because it held the federal law's provision dealt with the actual taking of property, which the federal government has always denied. The court also determined, she said, that a proposed coal exchange is not the only remedy for the taking."); *see also Kiewit, Charity Win $ 126 Million; SMCRA Provision Ruled A 'Taking'*, COAL WEEK (McGraw-Hill, Inc.), Nov. 20, 1989, Vol. 15, No. 47, p. 3; U.S. To Pay Wyoming Charity $ 150 Million For Taking Coal Under SMCRA, INSIDE ENERGY/WITH FEDERAL LANDS (McGraw-Hill, Inc.), Nov. 11, 1991, Surface Mining, p. 11. This outcome was also reported in the *New York Times* in 1992, sixteen years before Plaintiffs filed suit. Keith Schneider, *Environmental Laws Face a Stiff Test From Landowners*, N.Y. TIMES, January 20, 1992, at A1. Moreover, Plaintiffs allege in their Complaint filed in the District of Montana that "Plaintiffs were also close personal friends with Henry Burgess, a Sheriden, Wyoming, attorney who represented Whitney Benefits, Inc., in their *well-known decision* regarding the legislative taking of Whitney Benefits' coal. Through their connections with Mr. Burgess and Whitney Benefits' employees, the Plaintiffs saw the tactics utilized by the federal government in prolonging the inevitable. These tactics are reported in *Whitney Benefits, Inc.* v. *United States*, 752 F.2d 1554 (Fed. Cir. 1985)." *Nance*, No. CV-06-125-BLG-RFC (D. Mont. filed Aug. 29, 2006), Complaint ¶ 28 (emphasis added).

For these reasons, the court has determined that any claim for a regulatory taking of Plaintiffs' coal rights accrued no later than May 19, 1986.  The statute of limitations as to this claim ran on May 19, 1992, rendering the takings claims alleged in the Amended Complaint barred by 28 U.S.C. § 2501.  The court recognizes that Plaintiffs have apparently negotiated in good faith with the Government for decades.  Plaintiffs, however, are not without a remedy in this case.  The United States District Court for the District of Montana has entered a detailed Order under which "[t]he parties will enter into a binding exchange agreement by June 18, 2010."  Order, *Nance*, No. CV-06-125-BLG-RFC (D. Mont. May 19, 2009), at ¶ 11.

## IV.    CONCLUSION.

For the reasons stated herein, the Government's December 8, 2008 Motion to Dismiss is granted.  The October 8, 2008 Amended Complaint is dismissed without prejudice.  The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

<u>s/ Susan G. Braden</u>
**SUSAN G. BRADEN**
**Judge**